Howey, Judge,
delivered the opinion of the court:
This cause was referred to the court under section 1063, Comp. Stat., 1901, p. 738, 22 Stat., 485, and under the act of March 3, 1887, 24 Stat., 505, by the Acting Secretary of War. The first reference under the same sections by the *164 Secretary of the Navy, set forth in the record, did not give the court the necessary jurisdiction.
Plaintiffs entered into a contract in writing with the United States for certain excavation work to be done by them on the Colbert & Bee Tree Shoals Canal near Riverton, Ala., on the Tennessee River. Three different classes of material were to be excavated; for earth excavation, 0.1749 cent per cubic yard; for hardpan, 50 cents per cubic yard; and for rock excavation, $1 per cubic yard. Considerable controversy arose during the progress of the excavation work as to what constituted hardpan as contradistinguished from mere earth excavation, and the present action is to recover for the work alleged to have been done under the original and a supplemental contract. The details of the work covering the different stations need not be stated as the two agreements are the same as to terms, conditions, and specifications.
Before the contract was awarded test holes had been made by driving down steel rods at the different stations on the axis of the canal and usuahy also at points about 50 feet to the right and left of each station. The results were recorded subject to inspection by bidders. The Government did not guarantee the character of the material, and bidders were expected to assume responsibility. Bowlders of more than 9 feet in volume were classified as rock excavation. Material other than rock that could only be loosened by a six-horse plow, or removed by a steam shovel without blasting, was classified as hardpan. All other materials were classified as earth excavation. All excavation was to be measured in place and paid for on monthly estimates of yardage covering work done in a manner satisfactory to the Government engineer. The engineer was authorized to withhold any estimate in case satisfactory progress was not made, and in case of any doubt or disagreement arising under the specifications the decision of the engineer was to be final.
Under the administration of the first engineer officer in charge in the beginning of the supervision of the work, the classification of the material to be excavated as to quality and quantity was made by an assistant engineer. This assistant was the designated agent provided for by the con *165 tract. As the subordinate or designated agent he made an estimate of the material, and about every 10 days submitted progress charts, upon which monthly estimates were made out for the payments. His record of the work consisted of a series of cross sections (called progress charts) of the ground from which the material was excavated. These cross sections were drawn to a scale and made at intervals of a hundred feet (sometimes less) and contained the dimensions of the amount of work in each cross section which were used in making up the entire quantity and were the basis upon which the estimates of the different classes of material were made up and upon which the payments were made. Mr. Turrell was the designated agent, and his method of procedure was to calculate the areas of each section (or sometimes the whole or a part of each class was added together), and then to multiply the mean area by the distance between two sections which gave a general result in cubic feet and which was afterwards stated in cubic yards. As a consequence of the complaints of the contractors the engineer in chief examined the work and material and so construed the contract as to direct his subordinate agent how to classify the material — that is,, how to distinguish hardpan from earth excavation — the principal stating to his agent that if the normal output was reduced one-half or more by reason of the hardness of the material it would be proper to allow classification as hardpan if other conditions of the work favored such classification. The subordinate or designated agent then reclassified the material up to that time and made an allowance of about 14,000 cubic yards as additional hardpan, which increased the compensation of the contractors, for which they were paid with the approval and under the decision of the engineer in chief. Following this, an experienced classifier of material was appointed an inspector on the work carried on by direction of Turrell. This inspector personally went over the banks of the canal, using a mattock in examining the work. He established a hardpan line and explained to Turrell how to differentiate between hardpan and earth. He also used the plow test under the specifications and made a thorough investigation and showed Turrell that all the work done during the time he was there was in hardpan. *166 Turrell refused to follow the reclassifying methods adopted by the inspector.
Turrell also refused, for some reason not explained, to follow the directions given to him by the principal engineer officer after making the allowance of the 14,000 cubic yards which the principal engineer officer had directed. On the contrary, Turrell did not classify according to the construction given to the contract by his principal, nor did he observe or undertake to classify any more material according to the method pointed out by the inspector assigned to the work for the purpose of making a thorough investigation, except as hereinafter stated.
The principal engineer officer first in charge of the work does not appear to have had knowledge of the failure of his subordinate to obey the instructions, inasmuch as this principal was relieved from duty soon after the allowance of the 14,000 cubic yards. Complaints, were made again in regard to the classification to an officer who was placed in temporary charge.
This officer was succeeded by Maj. Harts, to whom the contractors again complained of the classification, protesting orally and in writing to the last engineer-officer of the way they were being treated. Plaintiffs submitted a formal claim in writing to the last officer in charge for 97,000 cubic yards of additional hardpan, amounting to $31,534.70.
The matter.being referred again to Turrell, the work was reexamined by him, and he made a confidential report for an allowance for hardpan of 56,170 cubic yards, amounting to $18,260.86. This recommendation was approved by Turrell’s superior officer on duty as the assistant engineer in local charge of the work.
From all the testimony and circumstances in evidence the court is satisfied that the subsequent failure of the subordinate officer who refused to observe the directions of the chief supervising engineer (after the allowance set forth in the first paragraph of Finding V) resulted in an erroneous classification. There is no explanation as to why this subordinate did not continue to classify according to his superior’s construction of the contract as to that material excavated for *167 which plaintiffs now seek compensation as hardpan excavation — the amount of hardpan involved in the present action being an addition to the 14,000 cubic yards between stations 30 and 60. Especially does it seem that after an experienced classifier of material had established a hardpan line by using the plow test contemplated in the specifications to the contract and explained to the local subordinate officer how to differentiate between hardpan and earth excavation there should have been no difficulty in making the necessary reclassification to conform to the order of the engineer in chief then on duty at the works. Be this as it may, the court is of opinion that the final action taken by the local subordinate officer in charge in conformity to and with that interpretation put upon the specifications by the first chief engineer (in response to the request of the district engineer and disbursing officer last in charge to examine the work again) is probably the best basis for a just settlement. At the same time the court is not unmindful that in limiting recovery to the sum recommended by the two officers named in the sixth finding, Turrell and Winn, the sum for which judgment is directed is possibly too small.
It is, however, reasonably doubtful that plaintiffs are entitled to the enormous amount claimed after the final decision in the War Office looking to a settlement of the dispute in the courts. The increase in plaintiffs’ estimate of hardpan excavation as made in the complaint before us is so far in excess of the formal claim made in the early part of the year 1908 that the court is impressed with the idea that the ad damnum is greatly exaggerated. Finding VI in its third paragraph discloses that in the early part of that year plaintiffs claimed for only 97,000 cubic yards as additional hardpan, which under the contract would have entitled them to $31,534.70. Their subsequent claim, which was later embodied in the petition and has been considered, is for enough additional hardpan to swell the claim to $122,072.12.
We come now to another and final question: Do the findings, taken all together, support the judgment under that line of decisions which make final the judgment of engineer officers *168 in contract cases? Kihlberg v. United States, 97 U. S., 398; United States v. Mueller, 113 ib., 153; Martinsburg & P. R. Co., v. March, 114 ib., 549; Chicago, Santa Fe, &c., R. R. v. Price, 138 ib., 185; Gleason v. United States, 175 ib., 588; Ripley v. United States, 220 ib., 491; 222 ib., 144; 223 ib., 695. In other words, in the view the court has taken of Government liability and the right of the contractors to prosecute a claim for anything more than the estimates before the chief engineer at the time he refused to make any modification of the estimates submitted to him as he found them (before the Turrell and Winn report) is the judgment warranted?
Paragraph 29 of the specifications provided that the decision of the engineer officer in charge as to quality and quantity should be final. That paragraph came under what the specifications termed general conditions.
Paragraph 54 provided that in case of any doubt or disagreement arising under the specifications the decision of the engineer should be final. By paragraph 55 the word “engineer” was understood to mean the United States Engineer officer in charge of the work or his designated agent. These two last paragraphs came under what the specifications termed special conditions.
The court has felt safe in adopting the decision of the engineer’s subordinate for the double reason that the word ' “engineer” was construed by the special conditions set forth in the specifications to mean the designated agent of the chief engineer and because this designated agent’s estimate conformed to the first engineer officer’s interpretation of the contract. No doubts have been suggested as to the correctness of the construction given to the contract by Maj. Newcomer, supported, as his construction was, by the examination of an experienced classifier of the material, and likewise supported, as the estimates finally were, by other officers whose integrity dues not seem to be involved.
The Chief of Engineers of the Army, at the seat of government, did not decide adversely to the contractors as to their right to bring suit for as much as the contractors thought they were entitled to receive. On the contrary, this high official declared that if Maj. Harts was satisfied that a mis *169 take had been made it should be corrected, but that if not satisfied the official estimates should be confirmed to the end that the contractors have the proper basis for future action. He declared that, considering the statements of Maj. Harts and the recommendations of Mr. Turrell that additional allowance be made, the contractors would have ample grounds upon which to base a claim for a better classification and that efforts should be made immediately for the gathering of all necessary information and data to defend the claim of the contractors elsewhere than by engineer officers. This decision was made after Maj. Harts had taken the ground that it was by no means clear that error had been made and that there was not sufficient data available on which he could base a correction should it be thought that a mistake in the classification had been made.
In refusing to make any modification of the estimates submitted to him this court must regard the decision of this officer as made without proper information and involving such doubt in his mind as to make the decision he did render a formal and perfunctory matter, to the end that the contractors might prove their right to another classification in this court, which alone possesses jurisdiction.
It is not doubted at this late day that where a contract provides that in case a disagreement arises under specifications the decision of the engineer is final unless there be fraud or such gross mistake on his part as to imply bad faith. In the case under consideration the contract went a little further in the use of those words which provide that in case of “doubt” the decision of the engineer should be final. ■But here the chief engineer’s doubt grew out of the fact that he did not see the excavated material and did not have opportunity to see or make any kind of an inspection of the material taken out. There was disagreement growing out of the doubt, and the doubt resulting in disagreement the two words must be taken to mean substantially the same thing. The rule mentioned applies to both doubt and disagreement.
The word “ engineer” was declared by the contract to mean the engineer officer in charge of the work or his designated agent. This designated agent made a decision, which was *170 in turn approved by one above him but subordinate to the chief engineer, who came to the work too late to have much knowledge either of the subject matter or of his duty in the premises. The court will not undertake to say under these circumstances that the chief engineer was obliged to accept the estimate made by the subordinate. This subordinate, as we have already seen, though sustained by two other officers in his estimates, probably could not have settled the matter after the chief engineer officer took charge and in conflict with the doubt of the latter official. The question is, then, whether the refusal of the chief engineer to modify under the circumstances set forth in Finding VI can be called a decision.
The rule mentioned required not only a decision but a decision involving the exercise of honest judgment. But here there was a failure to exercise anything more in the nature of a judgment beyond the expression of a doubt, which meant, if it meant anything, that the parties should have an opportunity to present proof to the tribunal having jurisdiction. If the chief engineer did not go to the work in time to form a judgment of his own it was his duty to take information, to the end that he might make a more certain decision. The refusal to modify the estimates arising out of the chief engineer's doubt being predicated confessedly upon the want of information, the court is of opinoin that there was a failure to exercise that kind of judgment that plaintiffs were entitled to receive. Under these circumstances it seems proper to say that there was a failure to exercise judgment for want of information when we consider that the doubt expressed was to give the contractors opportunity to make proof of their claim to a court which the chief engineer was unwilling to receive as a disbursing officer. The Government should have no more advantage in the failure of the engineer officer to better inform himself, if possible, and act more advisedly than in those cases where there was a failure on the part of the officer to exercise an honest judgment.
It seems to be a violation of the spirit and intent of the contract to bind the contractors in the decision of the chief engineer when it was a decision rendered without adequate information.
*171 While it is true that the chief engineer may not have been bound to accept the interpretation put upon the contract by his predecessors nor yet bound to receive as final the estimates recorded by others, nevertheless he was bound either to take proof to better satisfy his mind (thereby enabling him to comply with the rule that he must make an honest decision) on better proof or put the parties in position where they might present their proof in another forum.
The paragraph in the specifications can not be said to have been met when the agent’s judgment, being required, was followed by his refusal to act, the chief engineer believing at the same time that, in justice to the contractors, they should have the opportunity to present their case on more proof elsewhere.
The court is of opinion that the action of the chief engineer in charge of the works was tantamount to a refusal to render any decision at all. It was error on his part not to examine the sides or banks of the canals and to make such tests in connection with the accessible testimony as would enable him to render a decision approving the claim or disallowing the same. Inasmuch as this engineer officer took the view that he was a disbursing officer and that he could not decide the matter, we must regard his action as perfunctory and not a sufficient compliance with the specifications which required him to make a final decision on the merits of the claim.
In United States v. Adams, 9 Wall., 661, it was said that where proper findings are not made by this court on specific matters sufficient to enable the appellate court to properly review the judgment, additional findings should be made on a remand of the cause. This proposition was acted upon in Ripley v. United States, 220 U. S., 492. It may be our duty to be more explicit in the findings, but as the case presents enough, in our opinion, to enable the appellate court to review our action and proceed to final judgment on what we have found, we conclude to render judgment on the present findings. Injustice may result, if we do not, to the contractors.
The view of the court is that plaintiffs are entitled to judgment in the sum of $18,260.86, which is now directed to be entered.